**William H. WYTTENBACH, MD CHT, and Richard Smith, MD, Plaintiffs,**

v.

**ATOMA INTERNATIONAL, INC.; Toyota Motor Corporation; Toyota Motor Mfg., U.S.A., Inc.; and Toyota Motor Sales, U.S.A., Inc., Defendants.**

**No. 96 C 4474.**

United States District Court, N.D. Illinois, Eastern Division.

March 12, 1998.

Joseph Nevi Hosteny, Raymond P. Niro, Dean D. Niro, Paul K. Vickery, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Plaintiffs.

Manuel Sanchez, Yvette Rivas Diamond, Sanchez & Daniels, Chicago, IL, for Defendant Atoma Intern., Inc., Toyota Motor Corp.

Manuel Sanchez, Yvette Rivas Diamond, Sanchez & Daniels, Chicago, IL, Arthur D. Gray, George E. Badenoch, Robert A. Whitman, Kenyon & Kenyon, New York, NY, for Defendant Toyota Motor Mfg., U.S.A., Inc., Toyota Motor Sales, U.S.A., Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs William H. Wyttenbach and Richard Smith sue defendants Atoma International, Inc. ("Atoma"), Toyota Motor Corporation ("TMC"), Toyota Motor Manufacturing, U.S.A., Inc. ("TMM"), and Toyota Motor Sales, U.S.A., Inc. ("TMS")[1] for infringement of claims 1, 2, 4, 11, and 12 of United States Patent No. 4,533,176 (the "'176 patent"). Plaintiffs allege that Atoma manufactures and sells child restraint seats that embody and therefore infringe upon plaintiffs' patented invention. Plaintiffs further contend that the Toyota defendants infringe upon the '176 patent by selling and/or manufacturing motor vehicles incorporating Atoma's child restraint seats. Defendants deny that the accused seats infringe the claims of the '176 patent.

## BACKGROUND[2]

### *Procedural Facts*

As owners of the '176 patent, plaintiffs filed a complaint against Atoma on July 22, 1996, alleging that Atoma made and sold child restraint seats that infringe upon plaintiffs' device. Defs.' Facts ¶ 8. On September 26, 1996, plaintiffs amended their complaint to add charges against the Toyota defendants. *Id.* ¶ 9. Plaintiffs assert that the Toyota defendants infringe upon the '176 patent by importing, making, and/or selling vehicles incorporating the child restraint seats, which embody the patented invention. *Id.*

Defendants denied infringement of the '176 patent and asserted several affirmative defenses. *Id.* ¶ 10. Defendants filed a two-count counterclaim against plaintiffs seeking a declaratory judgment of non-infringement and invalidity of all claims of the '176 patent.[3] *Id.* ¶¶ 10–11.

---

1. When referring to these three defendants collectively, the Court will identify them as the Toyota defendants.

2. The facts are derived from statements that the parties filed with the Court under the Northern District of Illinois Local General Rule 12(M)–(N). Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends that there is no genuine issue." The movant's statement must contain "specific references to the affidavits, parts of the record, and other supporting material relied upon to support the facts set forth." Rule 12(M)(3). Defendants' statement is cited as "Defs.' Facts ¶___." Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Plaintiffs' response is cited as "Pls.' Facts ¶___." Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; under Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts.

Plaintiffs' additional facts are cited as "Pls.' Add'l Facts ¶___", and the defendants' reply is cited as "Defs.' Resp. Add'l Facts ¶___." All properly supported material facts set forth in either party's statements are deemed admitted unless properly uncontroverted. *See* Local Rule 12(M) and (N)(3)(b); *see also Flaherty v. Gas Research Institute,* 31 F.3d 451, 453 (7th Cir.1994). Moreover, the mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting material is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

3. Defendants also assert an inequitable conduct defense and seek a declaratory judgment of unenforceability as to all claims of the '176 patent. Plaintiffs subsequently filed a motion to dismiss defendants' inequitable conduct defense, which the Court converted into a motion for summary judgment. The Court stayed plaintiffs' motion for summary judgment on this issue, however, pending a resolution of the present motions for summary judgment.

Setting off a flurry of filing activity, defendants filed a motion for summary judgment on April 25, 1997, claiming that the accused seats do not infringe the '176 patent literally or under the doctrine of equivalents. Three days later during a Court-mediated settlement conference, plaintiffs indicated that they might require additional discovery to respond to Atoma's motion. Atoma opposed the extension on the grounds that additional discovery was unnecessary because its summary judgment motion raised purely legal, not factual, issues. The Court informed plaintiffs that if they required additional discovery, they should file a motion pursuant to Federal Rule 56(f).

Almost six weeks later, plaintiffs requested a one-week extension of the June 13, 1997 deadline for filing their response to Atoma's motion for summary judgment, which the Court granted. On June 20, 1997, plaintiffs filed a cross-motion for summary judgment, claiming that defendants' seats literally infringe the '176 patent. On that same day, however, plaintiffs filed a motion pursuant to Fed.R.Civ.P 56(f) seeking additional discovery to respond to defendants' motion for summary judgment regarding infringement under the doctrine of equivalents. Defendants then filed a motion for early consideration of plaintiffs' Rule 56(f) motion. The Court granted early consideration of the motion, but denied the discovery request without prejudice. Presently before the Court are the parties' cross-motions for summary judgment on the issues of literal infringement and infringement under the doctrine of equivalents, as well as plaintiffs' renewed Rule 56(f) motion.

### The '176 Patent

On July 21, 1983, inventor William Wyttenbach submitted his "Built-in Automatic Infant Restraint Seat" to the United States Patent and Trademark Office ("PTO") for patent[4] *Id.* ¶ 14. The invention, in layman's terms, consists of a fold-away child protection and restraining seat concealed within the adult passenger seat of a motor vehicle. *Id.* After rotating away the padding of the adult passenger seat, the child's seat may be placed in a position for use by a small child. *Id.* Wyttenbach's application originally contained fifteen claims. Those of particular relevance are set forth below. Defs.' Facts ¶ 23. Application claim 1, as originally filed, provided:

"A vehicle seat for adults in combination with a foldaway infant protection and restraining seat, said combination seat comprising: a seat member suitable for supporting an adult person in a moving vehicle including a support frame secured to the structure of said vehicle, and a contact portion secured to said support frame for receiving and contacting the body of a seated person, said contact portion including a section rotatable to between a first location and a second location; a restraining means secured to said support frame; and a child's seat movably secured to said support frame, said child's seat and restraining member movably cooperating with each other and said support frame and said rotatable section of said contact portion of said seat member to provide a first position wherein said child's seat and said restraining member are concealed by said rotatable section of said contact portion being in said first location and said seat member is suitable for occupancy by an adult, and movable to a second position wherein said rotatable section of said contact portion is in said second location and said child's seat is accessible and available for use by a small child, and wherein said restraining means and said child's seat are suitable for restraining a child in said child's seat against substantial impact forces."

Application claim 4, as originally filed, stated:

"The combination vehicle seat of Claim 1 wherein: said support frame includes a back portion and said contact portion including a back contact portion having a front section and a rear section, said rear section secured to said back support frame, and said front section being said rotatable section, and being rotatable attached to

---

4.  While Richard Smith is not listed as an inventor, plaintiffs agree he is co-owner of the '176 patent. *Id.* ¶ 2.

one of said rear section and said back support frame, said child's seat being located between said front and rear section when said rotatable section is in said first location and said child's seat is in said first position, and said front section suitable for moving away from said rear section to said second location so as to *reveal* said child's seat such that said child's seat *may* be placed in said second position for receiving and protecting a child." (emphasis added).

As originally filed, application claim 5 described:

"The combination vehicle seat of Claim 1 wherein: said support frame includes a lower support frame and said contact portion including a lower contact portion having a top section and a bottom section, said bottom section secured to said lower support frame, and said top section being said rotatable section, and being rotatably attached to one of said bottom section and said lower support frame, said child's seat being located between said top and bottom section when said rotatable section is in said first position, and said top section suitable for moving away from said bottom section to said second location so as to *reveal* said child's seat such that said child's seat *may* be placed in said second position for receiving and protecting a child." (emphasis added).

Application claim 11, as originally filed, stated:

"A vehicle seat for adults in combination with a foldaway infant protection and restraining seat, said combination seat comprising: a seat member suitable for supporting an adult person in a moving vehicle including a support frame secured to the structure of said vehicle, and a contact portion secured to said support frame for receiving and contacting the body of a seated person, said support frame including a back portion and said contact portion including a back contact portion having a front section and rear section, said rear section secured to said back support frame and defining a cavity, and said front section rotatably attached to one of said rear section and said back support frame; a restraining belt secured to said support frame; and a child's seat including a seat and back portion movably secured to said support frame, said child's seat and restraining member movably cooperating with each other and said support frame and contact portion of said seat to provide a [child's] seat, said child's seat movable to a first position between said front and rear sections and within said cavity, and wherein said child's body support means and said restraining member are concealed by said front section in said first location and said seat is suitable for occupancy by an adult, and a second position wherein said front section is in said second location and said child's seat is accessible and available for use by a small child, and wherein said restraining means and said child's seat are suitable for restraining a child in said child's seat against substantial impact forces."

Wyttenbach's application acknowledged prior patents for similar built-in child seats, but distinguished his invention on two grounds. Wyttenbach focused primarily upon the effective child-protection features offered by his invention. See Def. Ex. 2 at 1–3. While previously patented seats, Wyttenbach argued, were concerned only with convenience, his was the first device to incorporate adequate child-safety restraints. Wyttenbach's description further noted that "it is yet another object of the present invention to provide a restraining device which may be used by both infants which cannot set up without support and small children who may tend to be active." Def. Ex. 2 at 2–3. The device can achieve this versatility because the child seat rotates from a slightly slanted position (similar to an adult seat) to a semireclined position "suitable for use by small infants or children who cannot set without support."

### Prosecution History of the '176 Patent

In an Office Action dated October 4, 1984, the Patent Examiner for the PTO rejected application claims 1–3, 8, 9, and 11–15 under 35 U.S.C. § 103 on the basis of obviousness. *Id.* ¶ 26. In rejecting claims 1–3, 9, 11, 12, 14 and 15, the Patent Examiner stated "Audi et al shows the general combination claimed. Rothe shows a child's seat pivotally mounted

to an adult's seat. To provide the Audi, etc. device with means to hingedly mount his child seat in the manner shown is a matter of choice obvious to one having ordinary skill in the art." *Id.* ¶ 27. The Audi device refers to an integral adult/child seat in an automobile. The Rothe invention describes a barber's chair, whose backrest doubles as the bottom of a child seat.

The Patent Examiner similarly rejected application claims 8 and 13 "as being unpatentable over Audi, etc. and Rothe as applied to claims 1–3, 9, 11, 12, 14, and 15 above, and further in view of Mast et al. To provide the modified Audi, etc. assembly with control linkages as in Mast, et al. . . . is considered a matter of choice obvious to one having ordinary skill in the art." The Mast patent (No. 2,584,481) shows a seat that includes a fold-down armrest for use as a child seat. The Patent Examiner objected to claims 4–7 and 10 as being dependent on rejected base claim 1, but stated that application claims 4–7 and 10 "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims."[5] *Id.* ¶ 28; Pls.' Facts ¶ 28; Pls.' Add'l Facts ¶ 2.

In response, Wyttenbach's patent counsel, James C. Kesterson ("Kesterson"), amended the claims on January 3, 1985, Defs.' Facts ¶ 31. In the amendment, Kesterson canceled application claims 4, 5, 11, and 12. *Id.* ¶ 31. Kesterson indicated in the remarks to the amendment that "Claim 1 was amended to include the limitations of [application] Claim 4, thereby incorporating the Examiner's suggestion, and the limitations of [application] Claim 5 were combined with the limitations of [application] Claim 1 so as to provide a new Claim 16 and thereby also incorporating the Examiner's suggestion." *Id.* ¶ 32. The amendment further stated "that all of the claims now incorporate the Examiner's suggestion and are allowable, as they now clearly define over the Audi reference, Rothe and Mast et al. and all other references of record." *Id.*

The Patent Examiner accepted the January 3, 1985 amendment and issued Patent '176. *Id.* ¶ 33. As issued, the '176 Patent contained twelve claims, including: Amended Claim 1, which provides:

"A vehicle seat for adults in combination with a foldaway infant protection and restraining seat, said combination seat comprising:

a seat member suitable for supporting an adult person in a moving vehicle including a support frame with a back portion secured to the structure of said vehicle, and a contact portion including a back contact portion having a front section and a rear section, said rear section secured to said back support frame for receiving and contacting the body of a seated person, and said front section of said contact portion being rotatably attached to one of said rear section and said back support frame including a section rotatable to between a first location and a second location; a restraining means secured to said support frame; and a child's seat movably secured to said support frame, said child's seat and restraining member movably cooperating with each other and said support frame and said rotatable section of said contact portion of said seat member to provide a first position wherein said child's seat and said restraining member are concealed between said front and rear section by said front rotatable section of said contact portion being in said first location and said seat member is suitable for occupancy by an adult, and said child's seat movable to a second position whereby wherein said front rotatable section of said contact portion is moved away from said rear section to said second location and said child's seat is accessible and available for receiving and protecting use by a small child, and wherein said restraining means and said child's seat are suitable for restraining a child in said child's seat against substantial impact forces."

Claim 5 of the '176 patent states:

"The combination seat of claim 1 wherein said front section comprises a left and a

---

**5.** There are two types of claims in a patent: dependent and independent. While an independent claim stands on its own and does not refer to any other claim, a dependent claim relies upon and incorporates all of the limitations of at least one other claim in the patent. *C & F Packing Co., Inc. v. IBP Inc.*, 916 F.Supp. 735, 742–43 (N.D.Ill.1995).

right portion which left portion and right portions rotate away from said back portion to reveal said child's seat and to provide side protective panels to said child's seat."

Claim 12 of the '176 patent provides:

"A vehicle seat for adults in combination with a foldaway infant protection and restraining seat, said combination seat comprising:

a seat member suitable for supporting an adult person in a moving vehicle including a support frame with a lower support frame secured to the structure of said vehicle, and a contact portion including a lower contact portion having a top section and a bottom section, said rear section secured to said lower support frame for receiving and contacting the body of a seated person, and said top section of said contact portion being rotatably attached to one of said bottom section and said lower support frame between a first location and a second location; a restraining means secured to said support frame; and a child's seat movably secured to said support frame, said child's seat and restraining member movably cooperating with each other and said support frame and said rotatable section of said contact portion of said seat member to provide a first position wherein said child's seat and said restraining member are concealed between said top and bottom section by said top rotatable section of said contact portion being in said first location and said seat member is suitable for occupancy by an adult, and said child's seat movable to a second position whereby said top rotatable section of said contact portion is moved away from said bottom section to said second location and said child's seat is accessible and available

for receiving and protecting a small child, and wherein said restraining means and said child's seat are suitable for restraining a child in said child's seat against substantial impact forces."

Claims 2, 4, and 11 depend on claim I and, therefore, include all of the limitations of claim 1. Defs.' Facts ¶¶ 15, 18; Pls.' Add'l Facts ¶¶ 23–25. Claim 2 describes the restraining device as "a belt secured to support frame for snuggly encircling a child located in child's seat to prevent child from being thrown from child's seat upon the occurrence of substantial impact forces."[6] Pls.' Add'l Facts ¶ 23. Claim 4 describes the location of the child's seat and states "rear section of back contact portion defines a cavity for receiving child's seat so that child's seat may be folded into rear section when combination seat is in first position." *Id.* ¶ 24. And finally, claim 11 describes the folding mechanism of the child's seat as "seat and back portion of child's seat are rotatably attached to each other [so] that seat portion may fold toward and substantially against back portion so as to occupy less space." *Id.* ¶ 25. Claims 1 and 12 of the '176 patent are independent claims and differ mainly with respect to the location of the child's seat.

### Atoma's Carseat

Atoma designs, manufactures, distributes, and sells interior components for motor vehicles, including seating products. *Id.* ¶ 3. Atoma entered into an agreement with the Toyota defendants whereby Atoma agreed to supply the Toyota defendants with the accused device. *Id.* ¶ 7. The Toyota defendants perform various roles in the automobile manufacturing and sales process—TMM manufactures motor vehicles, TMS sells motor vehicles, and TMC manufactures and sells motor vehicles.[7] *Id.* ¶¶ 4–6.

---

**6.** In their reply in support of their cross-motion for summary judgment, plaintiffs concede that "[t]he question of literal infringement in this case comes down to a single issue: Can the defendants insert the words 'separate', 'separate from' and 'independent' into the Wyttenbach patent claims." Pls.' Rp at 1. We have narrowed our opinion in accordance with this admission. *See Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board,* 957 F.2d 302, 304 (7th Cir.1992) (finding that courts have no obligation to address issues

"merely raised, but not developed, in a party's brief.").

**7.** TMC is a Japanese corporation and has not been directly served in this action. Defs.' Facts ¶ 6. Plaintiffs, however, claim that service on U.S. subsidiary TMS is sufficient to confer jurisdiction over TMC because TMS is the managing agent for TMC. Pls.' Facts ¶ 6. TMC failed to answer plaintiffs' complaint and, therefore, plaintiffs request an entry of default against TMC. *Id.*

Atoma describes its accused seats as convertible "from an adult setting to a child setting by simply rotating a portion of the adult backrest, much like a fold down armrest." Defs.' Facts ¶ 62. Defendants contend that when unfolded, the rotating portion of the adult backrest itself serves as a seat for a child. *Id.* ¶ 63. An oversized cushion is attached to the bottom of the child seat with Velcro. This cushion can be readily removed for necessary cleaning. The seat is equipped with a five point safety harness for retraining and protecting the child. Defendants claim that their device is unlike the '176 patent, however, because plaintiffs' device requires a child seat structurally separate from, and · in addition to, the "front section" or "bottom section" of the adult seating component. *Id.* ¶ 17, 21; Defs.' Resp. Add'l Facts ¶ 9. Jeffrey T. Lambert ("Lambert"), who participated in the design and development of the Atoma seats, stated in his declaration that none of Atoma's seat contains a seat for a child that is an element structurally separate from, and in addition to, the adult seating components. Defs.' Facts ¶ 63. Instead, Lambert contends that, like the prior art, the rotating portion of the adult backrest in the Atoma seat itself functions as a seat for a child. *Id.*

While defendants contend that the claim's requirement that the child seat and adult seat be separate sufficiently distinguishes their device, plaintiffs argue that the defendants' device infringes claims 1, 2, 4, 11, and 12 of the '176 patent both literally and under the doctrine of equivalents.[8] For the reasons stated below, defendants' motion for summary judgment is granted, plaintiffs' cross-motion for summary judgment and Rule 56(f) motion are denied.

## LEGAL STANDARDS

Summary judgment is proper if the record reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cin-*

*cinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts", summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261. In ruling on the motion, the court must be mindful of the jury's province, reserving credibility determinations and the weighing of the evidence for the trier of fact.

Moreover, summary judgment is as appropriate in a patent case as any other—particularly with respect to issues regarding the proper scope of a patent claim. *See Markman v. Westview Instruments Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Courts should not enter summary judgment, however, if one party has been unable to exercise its opportunity for pretrial discovery. ' *Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts,* 840 F.2d 917 (Fed.Cir.1988); Fed.R.Civ.P. 56(f). If the requested discovery is not reasonably capable of adducing a genuine issue of material fact, a motion for additional discovery may be denied and summary judgment may be granted. *See Theotokatos v. Sara Lee Personal Products,* 971 F.Supp. 332 (N.D.Ill. 1997).

## ANALYSIS

### I. INFRINGEMENT

The essence of the parties' dispute is whether the '176 patent requires the child seat and the adult seat to be separate and

---

8. Claims 2, 4, and 11 depend upon, and therefore include all of the limitations of, Claim 1. If Atoma's device does not infringe Claim 1, then it cannot infringe the dependent claims either. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 n. 10 (Fed.Cir.1989). Claim 1 and

Claim 12 differ only in that Claim 12 requires that the child seat be concealed in the adult seat bottom, as opposed to the adult seat backrest. Accordingly, our analysis will focus primarily upon Claim 1, and incorporate the distinctions of Claim 12 when appropriate.

distinct elements. The plaintiffs claim that the patent allows for the child seat to be an integral part of the adult seat—that is, the adult seat backrest can form the child seat's bottom. The defendants contend that such a broad interpretation is inconsistent with the plain language of the patent, the specification and drawings, and the prosecution history, which require the child seat to be separate. Because they claim that their device does not embody plaintiffs' invention under a plain interpretation of the '176 patent, defendants claim that they have not infringed the '176 patent.

■ Title 35 U.S.C. § 271(a) provides that "whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States ... during the term of the patent ... infringes the patent." A device literally infringes the express terms of a patent if the accused device contains every limitation of the patent claim. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, ——, 117 S.Ct. 1040, 1045, 137 L.Ed.2d 146 (1997). A plaintiff is not without recourse in the absence of literal infringement, however, if there is an equivalence between the elements of the accused device and the elements of the patent. *Id.* "An accused device may infringe a claim under the doctrine of equivalents if it performs substantially the same overall function or work, in substantially the same way, to produce substantially the same overall result of the claimed invention." *Dolly, Inc. v. Spalding & Evenflo Co.,* 16 F.3d 394, 397 (1994). Under either approach, plaintiffs bear the burden of demonstrating that the defendants' device improperly infringes upon their patent. *Hughes Aircraft v. United States,* 717 F.2d 1351 (Fed.Cir.1983).

### A. LITERAL INFRINGEMENT

■ Literal infringement is found when the accused device reads on every limitation in the plaintiff's claim. The accused device must meet the limitations of the claim exactly to support a finding of literal infringement. *Lantech Inc. v. Keip Mach. Co.,* 32 F.3d 542, 547 (Fed.Cir.1994). Courts employ a two-step process in resolving infringement disputes. First, we interpret the asserted patent claim to determine its scope and meaning. *Dolly, Inc. v. Spalding & Evenflo Co.,* 16 F.3d 394, 397 (Fed.Cir.1994). Next, we determine whether the accused device falls within the scope of the properly interpreted claim. *Id.* The construction of a patent, including terms of art within a claim, is purely a question of law for a court—not a jury—to decide. *Markman v. Westview Inst.,* 517 U.S. 370, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996). Conversely, determining whether the accused device infringes upon the construed claim is a question of fact, which may be resolved on summary judgment if the record fails to disclose a genuine issue of material fact.

### 1. Construction of the Claims

■ In construing the '176 patent, we look to the plain language of the claim, the specification and drawings, other claims, as well as the prosecution history. *Markman v. Westview Inst.,* 517 U.S. 370, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996). The plaintiffs are quick to note that the Court may not rely upon the prosecution history to enlarge, diminish, or vary the limitations set forth in the claim. While plaintiffs' position is technically accurate, it fails to account for the fact that "the prosecution history, however, must also be considered in determining the literal meaning of the claims. [citations omitted] Although the doctrine of prosecution history estoppel technically applies only to the doctrine of equivalents, a particular interpretation of claim language can be disclaimed during prosecution." *Baxa Corp. v. McGaw, Inc.,* 981 F.Supp. 1348, 1354 (D.Colo.1997) (citing *Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 863–63 (Fed.Cir.1991)). Moreover, we are free to consider expert and inventor testimony, as well as other extrinsic evidence.

■ Plaintiffs point to the expert testimony of Dr. James G. Conley, a professor of mechanical engineering at Northwestern University. In his affidavit, Dr. Conley purported to review the '176 patent, the patent's history, as well as the parties' pleadings and exhibits. Dr. Conley defined the parties' dispute as centering around defendants' contention that their device does not infringe

because the '176 patent requires the child seat to be separate from the adult seat. Dr. Conley states, in a rather conclusory manner, that the '176 patent does not require such separate elements. While we find Dr. Conley's statements relevant, they are not conclusive. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 n. 6 (7th Cir.1981) (finding opinions that constitute ultimate conclusions are to be disregarded).

In examining the plain language of the patent, we agree with plaintiffs that Claim 1 never uses the phrase "separate from" or "independent of" in describing the relationship between the adult seat and the child seat. However, Claim 1 does describe the backrest of the adult seat as having a front section and a rear section, with the rear section secured to the back support frame. The Claim further notes that while the rear section is secured to the back support frame, the front section of the adult backrest is only rotatably attached to the rear section. Significantly, the child's seat is movably secured—not to the front or rear section of the adult backrest—but to the support frame, and is "concealed *between* said front and rear section" of the adult seat backrest. At no point does Claim 1 describe any portion of the child seat as being formed by or attached to the backrest of the adult seat. In addition, the language describing the child seat as concealed between the top and bottom sections of the adult seat indicates that the child seat is an element independent of the adult seat.

Plaintiffs make much of the claim's phrase "combination seat" in advancing their argument that the child seat can be formed by the adult seat. Plaintiffs' reliance upon the term "combination seat" is misplaced. A review of the patent reveals that the plaintiffs' were attempting to distinguish their device from those child seats that could be removed from the vehicle entirely. More-

over, the claim uses the term "combination seat" to describe an adult seat which is clearly separate from the child seat. In Claim 5, Wyttenbach references the "combination seat of claim 1," where the adult seat backrest is divided into a right section and a left section. The right and left sections rotate away "to reveal said child's seat," and form "side protective panels." It is clear that the adult seat backrest described in Claim 5 cannot form the child seat bottom, as the backrest instead rotates away to form the side protective panels. Plaintiffs have not demonstrated that the term "combination seat" demands or even allows an interpretation that the adult seat and the child seat are fused.

If this Court was required to review only the patent language, plaintiffs' contention that Claim 1 allows for a portion of the child seat to be formed by a portion of the adult seat might be more compelling. However, "[w]here the meaning of words in a claim is in dispute, or where different members of the community skilled in an art give the same term different meanings, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988). Defendants argue that the specification and drawings clearly identify the child seat as an item separate from and independent of the adult seat. According to the specification and drawings, the backrest of the adult seat is rotated away to reveal the child seat in a still-folded position. Only then may the child seat's bottom or horizontal section be rotated down, becoming suitable for holding and restraining a child. Every one of the plaintiffs' embodiments requires this two step process, and identifies the child seat as an independent element.[9]

We are mindful, however, that we cannot use the specification to read limitations into

9. Plaintiffs argue that Figure 3 identifies the child seat backrest as being formed by the adult seat bottom, clearly encompassing defendants' device. Figure 3 reveals, however, that the child seat is mounted to the adult seat with eyelet enclosures. The accused devise utilizes a pad attached to the child seat bottom with Velcro. Unlike the embodiment in Figure 3, this pad is readily removable for cleaning. In addition, a

two, and possible three step process is still required to place the child seat in a usable position. First the adult seat bottom is rotated up. The adult seat bottom is then secured to the adult seat backrest with fasteners or latches. Only then can the child seat be pulled down for use by the child. In light of these differences, we fail to see how Figure 3 advances plaintiffs' claim.

the claim, but only as a glossary to explain the terms of the claim. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum,* 849 F.2d 1430, 1433 (Fed.Cir.1988). In *Lemelson v. United States,* 752 F.2d 1538, 1551–52 (Fed.Cir.1985), the Federal Circuit reviewed the district court's conclusion that a claim required automatic prepositioning of a workpiece on a measuring device, because the specifications repeatedly referred to the automatic prepositioning. The Federal Circuit reversed, finding that even if the specifications only disclosed the automatic prepositioning device, "nowhere does the specification *require* automatic prepositioning," *Id.* (emphasis added).

This opinion must be reconciled, however, with the Federal Circuit's holding in *General American Transportation Corp. v. Cryo–Trans, Inc.,* 93 F.3d 766, 770 (Fed.Cir.1996). In *General American,* the Federal Circuit found the specification and drawings to be dispositive where they not only described the preferred embodiment, but provided only one, consistent embodiment for the invention. In construing the claim's use of the term "adjacent" to describe the placement of certain openings in a refrigerator railroad car, the court noted that the specification and drawings showed each opening next or adjacent to only one wall. Accordingly, the court interpreted and limited the claim to prohibit the openings from being next or adjacent to more than one wall. *Id.*

In the instant case, Wyttenbach's specification and drawings consistently refer to the child seat and the adult seat as separate entities. However, the specification and drawings at no time require the child and adult seats to be separate entities—with one possible exception. In distinguishing his invention from prior art, Wyttenbach noted that his child seat could accommodate both small infants who could not "set up" without support, as well as young children. Wytten-

bach's invention can provide such versatility because: 1) the bottom (or horizontal) section of the child seat is pivotally attached to the backrest (or vertical) section of the child seat; 2) the backrest section of the child seat is secured to the back frame of the vehicle seat; and, most significantly, 3) a "rack member" is attached to the base of the child seat which allows the child's seat to be moved from a normal slant position, suitable for young children, to a semi-reclined position, suitable for infants.[10]

In reviewing the description of the adult seat, there is no mention of the rack member being attached to or otherwise affecting the adult seat backrest.[11] More importantly, the description of the invention offers no indication of how the device might achieve such a result if the adult seat backrest formed the child seat bottom. In comparing the specification and drawings with the claim language, we note that nothing in the language suggests that the child seat should be formed by the adult seat. Accordingly, under the Federal Circuit's holding in *General American,* the patent language and the specification together support a separateness limitation. However, we need not rest our finding upon *General American* nor determine whether Wyttenbach's device requires the child seat to be independent of the adult seat in order to accomplish seating for both infants and small children, because the prosecution history clearly compels such a conclusion.

Defendants assert that the '176 patent prosecution history conclusively demonstrates that the adult seat and the child seat are separate and distinct elements of the '176 patent. We agree. A review of the Office Action reveals that the patent examiner rejected independent application claims 1 and 11, and merely objected to application claims 4 and 5 as being dependent upon application claims 1 and 11 The patent examiner instructed Wyttenbach's counsel to present ap-

---

**10.** Admittedly, this description is contained in the section entitled "BEST MODE FOR CARRYING OUT THE INVENTION." However, this is the only method for achieving the infant/child seat result presented in Wyttenbach's description of his invention. Because Wyttenbach sets forth the seat's ability to accommodate both infants and small children as one of his invention's objectives, and because this description is the only method of achieving this objective, we will not

ignore the impact of this description as constituting merely the device's preferred embodiment.

**11.** If the bottom (horizontal) section of the child seat could double as the backrest (vertical) section of the adult seat, we would expect to see some language in the claim describing the relationship of the rack member (or other device allowing the transition from infant seat to child seat) to the adult seat.

plication claims 4 and 5 in independent form for approval. Application claims 4 and 5, unlike the rejected application claims 1 and 11, stated that a portion of the adult backrest or seat bottom was rotatable "so as to reveal [the] child's seat such that [the] child's seat *may be placed . . . in a position* for receiving and protecting the child." Defs.' Mem. at 8–9; Defs.' Facts ¶¶ 29–30.

In rejecting application claims 1 and 11, the patent examiner referenced the Audi and Rothe devices. Significantly, both the Audi and Rothe devices utilize the backrest portion of an adult seat to form the bottom portion of a child seat. Wyttenbach's patent counsel, Kesterson, stated that in order to comply with the patent officer's recommendation, he canceled claim 4 and added all of the limitations in application claim 4 to application claim 1. On January 3, 1985, Kesterson filed amended claim 1 to the PTO. Kesterson testified that he believed that all of the limitations of application claim 4 were added to application claim 1 in the January 3, 1985 amendment. Defs.' Facts ¶ 34. Kesterson further testified that he never intended to make amended application claim 1 either broader or narrower in scope than application claim 4, and that any wording differences between the two are simply the result of his attempt to make application claim 1 "read like normal English." *Id.* Additionally, plaintiffs admit that application "claim 1 was amended to incorporate the limitations of [application] claim 4" and that claim 1 of the '176 patent is neither narrower nor broader in scope than application claim 4. *Id.* ¶ 35; Pls.' Facts ¶ 35.

Defendants argue that the patent examiner's reference to these prior patents demonstrates the primary and critical difference between application claim 4 and application claims 1 and 11—that application claim 4 clearly stated that a portion of the adult

backrest rotates "so as to reveal [the] child's seat such that the child's seat may be placed in . . . position for receiving and protecting a child." *Id.* The phrase *"may be* placed in . . . position for receiving and protecting a child" compels the conclusion that it also may not, and that a separate step must be employed to place the child seat in position for receiving and protecting a child. If another step is require after rotating the adult backrest, it stands to reason that the adult backrest does not form the child seat bottom. Defendants state that this distinction ultimately represents what the Patent Examiner rejected and what the Patent Examiner allowed, and makes clear that the claimed child seat and adult seat must be separate and distinct components of the asserted claims. *Id.*

The Court finds that defendants' arguments are supported by the undisputed evidence. Wyttenbach's counsel admitted that claim 1 was amended to include all of the limitations of application claim 4, and application claim 4 clearly required the adult seat to be rotated before the child seat could be folded down and made available for receiving the child. In doing so, Wyttenbach limited the permissible interpretations of his claims. See *Baxa Corp. v. McGaw, Inc.,* 981 F.Supp. 1348, 1355 (D.Colo.1997) (while the plain language of the claim may have been susceptible to the broad interpretation advanced by plaintiffs, plaintiffs' abandonment of certain interpretations during the prosecution history necessarily limits the permissible interpretations of the claim.) Moreover, plaintiffs fail to explain how their invention would survive comparison with prior art if we were to read the '176 patent in the broad manner advanced by plaintiffs.[12] In addition to the prior art referenced by the patent officer, there were no fewer than three patents prior to the '176 patent that described built-in automotive child seats. The Bernier Patent (No. 3,094,354), the Looney Patent (No. 2,294,039), and the Strahler Patent (No. 2,966,201) all show a child seat bottom that is formed from an adult seat back rest.

**12.** Plaintiffs argue that the Patent Examiner merely objected to application claims 4–7 and 10. Pls.' Resp. at 7. Plaintiffs also assert that application claim 4, as a dependent claim, included all of the elements of application claims 1 and 4. *Id.* Thus, because an objection is directed only at the form of the claim, as opposed to the merits, plaintiffs argue that application claim 4 was allowable in the first action over all of the prior art. *Id.* Plaintiffs, therefore, conclude that

the prior art was irrelevant to the amendment of application claim 1 and did not limit the scope of the claim in any regard. *Id.* Plaintiffs' argument misses the mark. Defendants do not dispute that application claim 4 was allowable on its merits. To the contrary, the fact that application claim 4 was merely objected to, and that application claim 1 was not allowed, forms the basis of defendants' interpretation of the '176 patent.

The Federal Circuit's decision in *Dolly, Inc. v. Spalding & Evenflo Co., Inc.*, further supports our conclusion. 16 F.3d 394 (Fed. Cir.1994). The *Dolly* court was asked to interpret the following portable child's chair claim: "a stable rigid frame which is formed in part from said side panels, and which along with said seat panel and said back panel provides a body supporting feature." 16 F.3d at 396. The court concluded that the claim's recitation of a two elements (the frame and the panels) and a relationship between the two, required the frame to be formed independent of the seat and back panels. *Id.* at 397.[13] Accordingly, the accused device that formed the frame from the side and back panels lacked a necessary limitation—the frame—and therefore did not infringe. *Id.* Similarly, the '176 patent recites two distinct elements, the adult seat and the child seat, and describes a relationship between the two—the child seat is concealed "between said front and rear section" of the adult seat backrest—that precludes a finding that the child seat can be formed by the adult seat.

This Court is obligated to interpret the '176 patent in a manner upholding its validity, when fairly possible. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 n. 6 (Fed.Cir.1990). Accordingly, we interpret the '176 patent to require a child seat that is separate from and independent of the adult seat. Our finding gives full effect to the language in the claims of the '176 patent, constitutes the only embodiment found in the specification and drawings, and represents a reasonable interpretation of the prosecution history. In comparing the '176 patent to the accused device, we find that defendants' device utilizes the backrest of the adult seat to form the bottom of the child seat. The seat is equipped with a five point safety belt harness, used for restraining and protecting the child. The backrest of the adult seat is rotated down to form the child seat—no further step is required to access the child seat. An oversized cushion is "Velcroed" to the bottom of the child seat with Velcro, providing comfort while enabling the seat to be readily removed for cleaning. The friction between the adult seat and the child seat cushion keeps the child seat in a vertical position until ready for use by a child. The affidavit of engineer Jeffrey Lambert, inventor of the Atoma device, is consistent with this interpretation.

Having interpreted both plaintiffs' and defendants' devices, we cannot conclude that defendants' child seat literally infringes upon the '176 patent. It is clear that the '176 patent contains the limitation requiring the child seat to be separate from the adult seat. Similarly, it is obvious that accused seats lack this limitation. Because literal infringement requires every limitation set forth in the '176 patent to be found in the accused device exactly, the lack of a separate child seat in the accused device precludes literal infringement. This is not the end of our inquiry, however, as we must determine whether defendants' device infringes upon the '176 patent under the doctrine of equivalents.

## *B. DOCTRINE OF EQUIVALENTS*[14]

The modern doctrine of equivalents was set forth by the Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), and further refined in *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Under this doctrine, a product or process that does not literally infringe upon

---

**13.** Plaintiffs argue that we must find infringement even if we accept defendants' arguments, because the accused device has merely combined one feature of the Wyttenbach patent (the adult seat) with another (the child seat). Plaintiffs assert that *Abbott Labs. v. Mead Johnson & Co.*, 1996 WL 332449 (N.D.Ill. June 13, 1996) holds that while a claim required two limitations, the limitations need not exist independently. However, in *Abbott Labs*, the court specifically found that the neither the claim language, the specifica-

tion, nor the prosecution history required the two elements to be separate. *Id.* at *6–7. Having found that the claim language, specification, and prosecution history of the '176 patent do require independent elements to be formed separate of each other, *Abbott Labs* is not controlling.

**14.** The judicially created doctrine of equivalents should not be confused with the statutory rule of equivalents of 35 U.S.C. Section 112. *See Zenith Electronics Corp. v. Exec. Inc.*, 1998 WL 9181, *5,

the express terms of a patent claim may nonetheless infringe if there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention. *Warner–Jenkinson Co.,* 520 U.S. at ——, 117 S.Ct. at 1049. Thus, the doctrine tries to "[prevent] a copyist from evading patent claims with insubstantial changes." *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.,* 983 F.2d 1039, 1043 (Fed.Cir. 1993).

■ A patentee may invoke the doctrine of equivalents if the accused devise "performs substantially the same function in substantially the same way to obtain the same result." [15] *See Zenith Electronics Corp. v. Exzec Inc.,* 1998 WL 9181, *5, 1998 U.S.Dist. Lexis 215, *16–17 (N.D.Ill. Jan. 5, 1998) (quoting *Graver Tank,* 339 U.S. at 608). Determining whether the accused device violates this "triple identity" test requires an objective [16] inquiry into the individual elements of the claim, not to the invention as a whole. *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1049. Therefore, a showing of overall equivalency of the patented product to the accused product will not be sufficient to prove infringement. *Bradshaw v. Igloo Products Corp.,* 1997 WL 543109, *3, 1997 U.S.Dist. Lexis 13258, *9 (N.D.Ill. Sep. 2, 1997). This element–by–element analysis is meant to prevent the enlargement of a patent beyond the scope of its claims as allowed by the Patent and Trademark Office. *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1049.

■ In analyzing the claims of a patent, a court may examine the context of the patent, the prior art, and the particular circumstances of the case. *Graver Tank,* 339 U.S. at 609. A skilled practitioner's knowledge of the interchangeability between the claimed and accused elements is also relevant to the extent it sheds light on the concept of "equivalence." *Undersea Breathing Sys.,*

*Inc., v. Nitrox Technologies, Inc.,* 985 F.Supp. 752, 768 (N.D.Ill.1997). "[T]he proper time for evaluating equivalency—and thus knowledge of interchangeability between elements—is at the time of infringement, not at the time the patent is issued." [17] *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1053.

■ The scope of equivalency may be limited by the doctrine of prosecution history estoppel. Prosecution history estoppel prevents the patentee from recapturing subject matter that was surrendered during the prosecution in order to promote allowance of the claims. *Undersea Breathing,* 985 F.Supp. at 768. For example, if a claim has been narrowed by an amendment to avoid prior art rejection, the patentee may not argue that the surrendered subject matter is within the range of equivalents. *Id* at 768. However, if the patent-holder demonstrates that an amendment required during prosecution had a purpose unrelated to patentability, a court must consider that purpose in order to decide whether an estoppel is precluded. *Warner–Jenkinson,* 520 U.S. at —— – ——, 117 S.Ct. at 1050-51.

■ We note that in *Hassell v. Chrysler Corp.,* an Ohio district court had an opportunity to analyze the Atoma device. 982 F.Supp. 515 (S.D.Ohio 1997). In doing so the court noted that the plaintiff's device required an additional step in deploying the child seat. Conversely, the Atoma product achieved a one-step, pull-down deployment. The Court concluded that this distinction, along with others, precluded a finding of equivalency. *Id.*

We similarly find that the one-step deployment afforded by the Atoma device is not the equivalent of the two-step deployment required by the '176 patent, because such a

---

1998 U.S.Dist. Lexis 215, *16 (N.D.Ill. Jan. 5, 1998); *Undersea Breathing Sys., Inc. v. Nitrox Technologies, Inc.,* 985 F.Supp. 752, 768 (N.D.Ill. 1997).

15. However, this so called "triple identity" test is not the only linguistic framework that may be used. As the Supreme Court recognized, other methods such as the "insubstantial differences" approach may be appropriate depending on the particular facts of a case. *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1054.

16. The intent of the accused plays no role in the doctrine's application. *Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1052.

17. The nature of the invention set forth in the patent can also affect the scope of equivalence. Pioneer patents are entitled to a broader range of equivalents than those that make mere improvements in the art. *Zenith Electronics,* 1998 WL 9181, *5, 1998 U.S.Dist. Lexis 215, at *17–18. "A pioneer patent is a distinct step in the progress of the art, distinguished from mere improvement or perfection of what has gone before." *Id.*

finding would read an express limitation out of the '176 patent. In the instant case, the doctrine of prosecution history estoppel prevents plaintiffs from attempting to recapture defendants' embodiment of the built-in child seat. It is clear that the patent examiner required Wyttenbach to incorporate the limitations set forth in application claim 4—including the limitation that the child seat may be folded down after the adult seat is rotated away—in order to achieve patentability. Plaintiffs have failed to demonstrate that the patent officer's direction was unrelated to patentability. To the contrary, the patent officer explained that, as presented, application claim 1 infringed upon prior art. Accordingly, plaintiffs cannot now attempt to recover the broad interpretation offered in application claim 1 through the doctrine of equivalents. *International Visual Corp. v. Crown Metal Manufacturing Co.*, 991 F.2d 768 (Fed.Cir.1993); *see also Dolly, Inc. v. Spalding & Evenflo Co., Inc.*, 16 F.3d 394, 398–99 (Fed.Cir.1994) (rejecting plaintiff's claim that the defendants' device infringed its patented child seat, where the plaintiff's device required a separate frame and defendants' did not, because the frame requirement was an express limitation of the patent.)

We find that the accused device does not infringe the '176 patent either literally or under the doctrine of equivalents. Therefore, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted. Furthermore, our analysis also compels us to deny plaintiffs' motion pursuant to Fed.R.Civ.P. 56(f). We expressly note that our finding of non-infringement is based exclusively upon our interpretation of plaintiffs' claim. *Baxa Corp. v. McGaw, Inc.*, 981 F.Supp. 1348 (D.Colo.1997) (acknowledging that interpretation of the plaintiff's claim, a matter of law, is usually outcome determinative). Because we find that further discovery is not likely to raise a genuine issue of material fact that would affect the Court's judgment, extending discovery is inappropriate. *Theotokatos v. Sara Lee Personal Products*, 971 F.Supp. 332 (N.D.Ill.1997).

## CONCLUSION

While both parties have developed child safety seats to be used in automobiles, their devices differ to a sufficient degree so as to preclude any finding of infringement. Accordingly, the defendants' motion for summary judgment is granted. The plaintiffs' cross-motion for summary judgment and Rule 56(f) motion for additional discovery are denied. The Clerk of the Court is instructed to enter final judgment for defendants and against plaintiff's pursuant to Fed.R.Civ.P. 58.